IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| | : |
| | : |
| IN RE ACTERNA CORPORATION SECURITIES LITIGATION | : Civil Action No. DKC 2003-1131 |
| | : |
| | : |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this class action alleging violations of federal securities laws are Defendants' separate motions to dismiss Plaintiffs' Consolidated Amended Class Action Complaint under Fed.R.Civ.P. 12(b)(6). Also pending is Plaintiffs' motion to strike certain exhibits filed by Defendant PricewaterhouseCoopers LLP ("PwC"). The issues have been fully briefed and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiffs' motion to strike will be granted in part and denied in part, and the motions to dismiss will be granted.

**I.   Background**

**A.   *Factual Background***

The following facts are alleged in Plaintiffs' Consolidated Amended Class Action Complaint ("the complaint"), filed on behalf of all persons who purchased or otherwise acquired shares

of Acterna Corporation ("Acterna" or "the company") common stock between August 14, 2001, and October 29, 2002 ("the Class Period").[1]  The defendants in this action were five of Acterna's most senior officers leading up to and during the Class Period ("the individual Defendants"), Clayton, Dubilier & Rice, Inc. ("CD&R"), Acterna's largest shareholder, and PricewaterhouseCooper ("PwC"), Acterna's outside auditor. Defendant Ned C. Lautenbach joined Acterna in 1998, and at all times during the Class Period was Acterna's Chairman and Chief Executive Officer ("CEO").  Lautenbach was also a principal and director of CD&R.  Defendant John D. Ratliff was the Senior Vice President and Chief Financial Officer ("CFO") of Acterna's communications test and management unit from June 2000 to December 31, 2001.  On January 1, 2002, Ratliff became Acterna's Corporate Vice President and CFO.  Defendant Allan M. Kline served as Acterna's Corporate Vice President, CFO, and Treasurer until December 31, 2001, when Ratliff took over.  Thereafter, Kline continued as a member of Acterna's Board of Directors ("the Board").  Defendant John R. Peeler had been a member of the Board since May 21, 1998.  In July 2001, he was elected

---

[1] The complaint also contains common law claims of fraud and breach of fiduciary duties on behalf of all persons who purchased or otherwise acquired shares of Acterna common stock *prior to* August 14, 2001 and retained such shares through the end of the Class Period.

President of the Board.   At all times during the Class Period,
he was President and CEO of Acterna's testing and management
business.   Defendant Robert W. Woodbury, Jr. was, at all
relevant times, Acterna's Corporate Vice President and Principal
Accounting Officer.

1.   *Events Prior to Class Period*

Acterna provides test and management services for optical
transport, access, and cable networks to customers located
around the world.  In May 2000, Acterna, then known as Dynatech
Corporation, paid $402 million to purchase Wavetek Wandel
Goltermann, Inc. ("WWG").  Approximately $274.8 million of the
purchase price was allocated to goodwill.[2]   In August 2000,
Acterna paid $171.5 million to purchase Superior Electronics
Group, Inc. d/b/a Cheetah Technologies ("Cheetah").
Approximately $87.7 million of the purchase price was allocated
to goodwill.   As a result of these acquisitions, Acterna
purportedly added approximately $362.5 million in goodwill to
its balance sheet, and positioned Acterna to be, according to
Lautenbach, "a new company with the size, the resources and the

---

[2] According to the complaint, Acterna was founded in 1959 as
Dynatech Corporation, but changed its name to Acterna in
September 2000.  For the sake of simplicity, it will be referred
to as Acterna throughout.

products to become a leader in the communications solutions industry." Paper 28, ¶ 40.

Plaintiffs allege that the market initially responded positively to Acterna's acquisitions, with its share price soaring from $10.37 on February 14, 2000 (the date of the announcement of the merger with WWG) to a peak of $41.38 on August 29, 2000 (immediately after the Cheetah acquisition). However, during 2001, there was a slowdown in the global communications industry, resulting in reduced capital spending in that sector, which included many customers for Acterna's test and management products. As a result of the slowdown, Acterna's share price began a steady decline, falling from the one-time high of $41.38 on August 29, 2000 to $5.48 on August 14, 2001 (the beginning of the Class Period). As will be discussed below, throughout the Class Period, Acterna's financial well-being continued to suffer severely as a result of the slowdown.

2.   *The Alleged Misrepresentations and Omissions*

Plaintiffs allege that throughout the Class Period, Acterna issued numerous statements and filed quarterly and annual reports with the Securities and Exchange Commission ("SEC") that the individual Defendants and PwC knew, or were reckless in not knowing, were materially false and misleading because they failed to disclose and/or misrepresented adverse facts about

4

Acterna's financial performance.   Essentially, the violations Plaintiffs' allege can be boiled down to two main categories: (1) pertaining to the testing and valuation of Acterna's goodwill, and (2) pertaining to violations of Generally Accepted Accounting Principles ("GAAP").

First, with respect to statements and omissions concerning Acterna's goodwill, in 2001, the Financial Accounting Standards Board issued Financial Accounting Standards No. 142 ("FAS 142"). FAS 142 requires companies to perform an annual test of their goodwill to determine if any impairment exists.   If so, the company is required to write down the goodwill and take a charge against earnings.   Plaintiffs allege that throughout the Class Period, Acterna filed numerous reports with the SEC, in which it stated that it had adopted FAS 142, that it had tested its goodwill pursuant to FAS 142, and that it had determined that its goodwill was not impaired.   Plaintiffs identify the following public filings as containing alleged misstatements: (1) First Quarter 2002 10-Q signed by Woodbury and Kline (filed August 14, 2001); (2) Second Quarter 2002 10-Q signed by Woodbury and Kline (filed November 14, 2001); (3) Third Quarter 2002 10-Q signed by Ratliff and Woodbury (filed February 13, 2002); (4) 2002 Annual 10-K signed by all the individual Defendants (filed June 18, 2002); (5) First Quarter 2003 10-Q

signed by Ratliff (filed August 14, 2002). In addition, Plaintiffs point to the financial statements Lautenbach and Ratliff certified on August 14, 2002, attesting to the accuracy of Acterna's statements, including those regarding the adoption of FAS 142 and the valuation of Acterna's goodwill.

According to Plaintiffs, the Class Period began on August 14, 2001, when Acterna filed its First Quarter 2002 10-Q for the period ending June 30, 2001 ("2002 1.Q. 10-Q"). In this filing, the company stated that although "[t]he provisions of FAS 142 will be effective for fiscal years beginning after December 15, 2001 . . . the Company has elected to early adopt the provisions effective April 1, 2001." Paper 28, ¶ 52. Plaintiffs allege that by stating it had adopted FAS 142, Acterna was representing that it had tested its goodwill for impairment, that it would take a goodwill impairment charge if its goodwill was impaired, and that if it was not taking a goodwill impairment, [it] was representing that its goodwill was not impaired." *Id*.

On November 14, 2001, Acterna filed its Second Quarter 2002 10-Q for the period ending September 30, 2001 ("2002 2.Q. 10-Q"). In its filing, Acterna reported that, due to the continued economic slowdown, net sales were down 12% from the same period in the previous year, orders of its critical communications test products were down 49% from the same period in the previous

6

year, and it was posting a $147.5 million net loss for the quarter. With respect to its goodwill, Acterna reported a net of $435.8 million of which $379.8 million was attributed to the Communications Test division. It also stated that the company had "completed its transitional impairment test of goodwill for all reporting units required under FAS 142 and determined that goodwill [was] not currently impaired." *Id.*, ¶ 59 (quoting 2002 2.Q. 10-Q).

Throughout the Class Period, Acterna's financial condition continued to deteriorate steadily. On January 30, 2002, Acterna issued a press release announcing its financial results for the quarter ending December 31, 2001. As Plaintiffs admit, the "news was not good." Paper 28, ¶ 62. Net sales were down 33% from the same period in the previous year, and down 21% from the previous quarter. Sales of communications test products dropped to $187.2 million, down from $243.9 million in the previous quarter. The company also reported a net loss that quarter of $74 million, or $0.39 per share. However, orders for communications test products rose 10% from the previous quarter, but were down 45% from the previous year. The company also reported a total debt of $1.1 billion. On February 13, 2002, the company filed its Third Quarter 2002 10-Q ("2002 3.Q 10-Q") reiterating the poor financial results reported in the press

7

release.  It also stated, like in its earlier quarterly filings, that the company had completed its transitional impairment test of goodwill as required under FAS 142 and had determined that goodwill was not currently impaired.

On May 29, 2002, Acterna issued a press release announcing its financial results for the quarter ending March 31, 2002 (the fourth quarter of fiscal year 2002).  Again, the news was bleak. The company disclosed that net sales for the quarter were down 46% from the same period in the previous year, and down 15% from the previous quarter.  Sales of communications test products were down from $299 million a year earlier to $147 million.  In addition, communications test product orders were down 66% from the prior year, and 28% from the previous quarter.  For the full fiscal year 2002 (April 1, 2001 to March 31, 2002), Acterna's net sales were down 17% from fiscal year 2001.  In addition, the company reported a net loss for fiscal year 2002 of $375 million.

On June 18, 2002, Acterna filed its 10-K Annual Report for the 2002 fiscal year ("2002 10-K"), which reiterated the financial results reported in the earlier press release.  In addition, the company explained the methodology it used to ascertain whether goodwill was impaired, as well as the effect the implementation of FAS 142 had on valuation of goodwill.

8

Once again, the company stated that it had performed an annual impairment test as required by FAS 142, and had determined that goodwill was not impaired.  Plaintiffs allege this statement was blatantly false because, as will be discussed below, "by March 2002 Acterna and PwC had determined that Acterna's goodwill was impaired and that the Company would have to take a substantial goodwill impairment charge."  *Id.*, ¶ 74.[3]

On July 31, 2002, Acterna announced its financial results for the first quarter of fiscal year 2003.  Once again, the company reported decreased sales and orders from the previous quarter.  On August 14, 2002, Acterna filed its First Quarter 2003 10-Q ("2002 1.Q. 10-Q").  In it, Acterna stated:

> As a result of the continued industry slowdown, the Company continues to assess the value of goodwill on a quarterly basis. Such an assessment was performed at June 30, 2002 and based on current quarter operating results and expectations of future earnings, the Company determined that its goodwill was not impaired at June 30, 2002.

Paper 28, ¶ 77.  However, the company expressly warned that it "will continue to assess the value of goodwill for impairment on a quarterly basis and can provide no assurance that an

___

[3] PwC is alleged to have issued an essentially unqualified audit opinion, incorporated in the 2002 10-K, that was itself materially false and misleading and represented an "extreme departure" from Generally Accepted Auditing Standards (GAAS) and Generally Accepted Auditing Principles (GAAP).  Paper 28, ¶¶ 107, 108.

impairment adjustment will not be necessary." *Id*.  Also on

August 14, 2002, Acterna issued a press release stating that the

company had filed with the SEC its Form 8-K report, with

attached certifications from Defendants Lautenbach and Ratliff,

in which they attested to the accuracy of Acterna's financial

statements.

       *3.   The Goodwill Write-off*

    On October 30, 2002, Acterna issued a press release

announcing its financial results for the second quarter of

fiscal 2003.  In addition to reporting yet another disappointing

quarter of sales and orders, the company took a charge of $388

million for goodwill and other asset impairment in the

communications test unit.  In part because of the goodwill

impairment charge, the company reported a net loss of $284

million for the quarter.  By this time, the price of Acterna's

common stock had decreased approximately 94% throughout the

Class Period, falling from $5.48 per share on the first day

(August 14, 2001) to $0.33 per share on the last (October 29,

2002).  Despite the bleak financial portrait the company had

been painting for several quarters throughout the Class Period,

and the dramatic decline in its stock price, Plaintiffs allege

that on October 30, 2002, Acterna "shocked the financial markets

by taking a massive $388 million goodwill impairment charge" in the second quarter of fiscal 2003.  *Id.*, ¶ 98.

### B.   *Procedural Background*

On April 16, 2003, a securities fraud class action was filed against Acterna and the individual Defendants.  The first suit in this class action, Huang et al. v. Acterna Corp., et al., Civil Action No: DKC-03-1131, was filed by Sik-Lin Huang, on behalf of a class consisting of all those who purchased or otherwise acquired the common stock of Acterna between August 1, 2001 and October 31, 2002, and who were damaged thereby.  On August 9, 2004, the court granted the motion of Joseph De Leo and Stan Andrew for appointment as lead plaintiffs and their selection of lead counsel and recaptioned the case as: In re Acterna Corporation Securities Litigation.  *See* Paper 23.  It also granted Plaintiffs' request to file, if necessary, an amended complaint.  *Id.*

On October 6, 2004, Plaintiffs filed their Consolidated Amended Class Action Complaint, dropping Acterna as a defendant due to its recent discharge in bankruptcy, and naming, in addition to the individual Defendants, Pricewaterhouse Coopers LLP ("PwC") and Clayton, Dubilier & Rice, Inc., ("CD&R").[4]  As

---

[4] In May 2003, Acterna filed for bankruptcy under Chapter 11
(continued...)

11

mentioned above, the amended complaint was filed on behalf of all persons who purchased or otherwise acquired shares of Acterna common stock between August 14, 2001, and October 29, 2002 ("the Class Period"). Plaintiffs allege in the "first claim" that the individual Defendants and PwC violated § 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b) (1997), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and in the "second claim" that the individual Defendants and CD&R violated § 20(a) of the Securities and Exchange Act, 15 U.S.C. § 78t(a). Plaintiffs also assert claims for common law fraud against the individual Defendants and PwC, and breach of fiduciary duty against the individual Defendants.

On January 14, 2005, the individual Defendants, PwC , and CD&R filed separate motions to dismiss, each arguing that Plaintiffs have failed to state a claim for a violation of § 10(b) and Rule 10b-5, and that they have not met the heightened pleading standard required under the Private Securities Litigation Reform Act ("PSLRA"). *See* Papers 42 (PwC), 44 (the individual Defendants), and 45 (CD&R).

---

[4](...continued)
of the Bankruptcy Code. Approximately five months later, it emerged from Chapter 11 reorganization as a privately held business owned by CD&R and other lenders.

## II.  Standard of Review

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In reviewing the complaint, the court accepts all well-pled allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir. 1997).  In deciding a Rule 12(b)(6) motion, the court will consider the facts stated in the complaint and the documents attached to the complaint.  The court may also consider documents referred to in the complaint and relied upon by plaintiff in bringing the action. *Biospherics, Inc. v. Forbes, Inc.*, 989 F.Supp. 748, 749 (D.Md. 1997) (citing *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 46-48 (2nd Cir. 1991)).  Thus, it is appropriate for the court to consider any relevant press releases and public disclosure documents referenced and relied upon by Plaintiffs without converting the motion to dismiss into a motion for summary judgment. *See In re Criimi Mae, Inc. Securities Litig.*, 94 F.Supp.2d 652, 656 (D.Md. 2000).

13

To survive the motion to dismiss, Plaintiffs must have alleged facts that show they are entitled to relief on their substantive causes of action.  To state a claim for relief under § 10(b) and Rule 10b-5, Plaintiffs must sufficiently allege that (1) Defendants made a false statement or omission of material fact (2) with scienter (3) upon which Plaintiffs justifiably relied (4) that proximately caused Plaintiffs' damages. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999) (citing *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir. 1994)).  When, as here, a plaintiff alleges a "fraud on the market" theory, it is not necessary to prove individual reliance on the false or misleading statements. *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 n.1 (4th Cir. 1999); *In re Criimi Mae*, 94 F.Supp.2d at 656.  Instead, Plaintiffs may show that they indirectly relied on statements by relying on the integrity of the market price of the stock. *Longman*, 197 F.3d at 682 n.1.  However, as the Supreme Court recently has made clear, a plaintiff must still adequately allege "proximate causation and economic loss" in order to survive a Rule 12(b)(6) motion. *See Dura Pharmaceuticals, Inc. v. Broudo*, 125 S.Ct. 1627, 1633 (2005) ("The [PSLRA] thereby makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs

14

adequately allege and prove the traditional elements of causation and loss.").

Because § 10(b) claims are fraud claims, the plaintiff must also satisfy the pleading requirements imposed by Fed.R.Civ.P. 9(b). *In re Medimmune, Inc. Securities Litig.*, 873 F.Supp. 953, 960 (D.Md. 1995). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Particularity of pleading is required with regard to the time, place, speaker and contents of the allegedly false statement, as well as the manner in which the statements are false and the specific facts raising an inference of fraud. *Medimmune*, 873 F.Supp. at 960; *In re Criimi Mae*, 94 F.Supp.2d at 657.

The PSLRA imposes additional pleading requirements on plaintiffs in securities fraud actions. Most notably, the PSLRA has heightened the requirements of Rule 9(b) for pleading scienter.[5] Under Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Under the PSLRA, however, a complaint must, "with respect to each act or omission alleged to violate this chapter, state with

---

[5] Scienter is a "mental state embracing an intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976).

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Fourth Circuit has held that scienter under the PSLRA may be alleged by "pleading not only intentional misconduct, but also recklessness," *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 344 (4th Cir. 2003), and has defined recklessness as "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 343 (quoting *Phillips*, 190 F.3d at 621). Moreover, in evaluating scienter allegations, the Fourth Circuit applies:

> a flexible, case-specific analysis . . . . [C]ourts should not restrict their scienter inquiry by focusing on specific categories of facts, such as those relating to motive and opportunity, but instead should examine all of the allegations in each case to determine whether they collectively establish a strong inference of scienter. And, while particular facts demonstrating a motive and opportunity to commit fraud (or lack of such facts) may be relevant to the scienter inquiry, the weight accorded to those facts should depend on the circumstances of each case.

*Ottmann*, 353 F.3d at 345-46.[6]   In sum, to survive a motion to dismiss, plaintiffs must successfully plead with particularity facts specific to each defendant that create a strong inference that the defendant acted knowingly or recklessly in making material misrepresentations or omissions.   *See In re Royal Ahold N.V. Securities & ERISA Litig.,* 351 F.Supp.2d 334, 369 (D.Md. 2004).   They must also adequately allege "loss causation," i.e., a causal connection between the material misrepresentation and the plaintiffs' economic loss.   *See Dura Pharms.,* 125 S.Ct. at 1631; *Keeney v. Larkin*, 306 F.Supp.2d 522, 541 (D.Md. 2002) (finding that the plaintiff pled no facts suggesting that the delayed disclosure of the allegedly false and misleading omission was a proximate cause of his economic harm).

## III. Plaintiffs' Motion to Strike

Before turning to the merits of the dismissal motions, the court will first consider Plaintiffs' motion to strike certain exhibits filed by Defendant PwC.   Specifically, Plaintiffs move

---

[6] As the court in *Ottmann* noted, motive and opportunity are factors that should be considered collectively with the other allegations in evaluating whether a complaint successfully alleges scienter, but they are not essential.   353 F.3d at 345-46.   Although motive may be a good indication of scienter, simply alleging a defendant's desire to protect his job and compensation is not sufficient, because these motives may be seen as common to all corporate executives.   *In re Criimi Mae*, 94 F.Supp.2d at 660.

to strike Exhibits 4, 7, 8, 11, 14, 15, 17, 19, 23, and 25 because they were not referred to in the complaint and were not relied upon by Plaintiffs in bringing this action.   Paper 55.[7]

As stated above, when ruling on a 12(b)(6) motion, the court may consider documents referred to in the complaint and relied upon by the plaintiff in bringing the action.   *Biospherics, Inc.,* 989 F.Supp. at 749.   "In securities fraud actions, courts will also examine the other information that was publicly available to reasonable investors at the time the defendant made statements plaintiffs alleged were fraudulent, including documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which plaintiff's allegations necessarily rely."   *In re First Union Corp. Securities Litig.,* 128 F.Supp.2d 871, 883 (W.D.N.C. 2001) (citing *Phillips*, 190 F.3d at 617).   Plaintiffs have not specifically referred to or discussed any of the exhibits they seek to strike.

Defendant PwC counters that the exhibits Plaintiffs move to strike were in fact relied upon, referred to, and integral to Plaintiffs' complaint.   It points to the first paragraph of the

---

[7] Plaintiffs do not object to, nor do they dispute the accuracy of, the remaining Exhibits attached to PwC's motion to dismiss.

complaint, in which Plaintiffs state that their allegations are based on, *inter alia*, "review and analysis of press releases, public statements, news articles, securities analysts' reports and other publications disseminated by or concerning Acterna," as well as "news articles, public filings, press releases and other public information disseminated by or concerning [PwC]." *See* Paper 28, ¶ 1.  However, neither this paragraph, nor any others, demonstrates that Plaintiffs relied on the specific analysts' reports (Exs. 4, 7, 8, 11, and 19) or public newspaper and newswire articles (Exs. 14, 15, 17, and 23) Plaintiffs seek to strike.  *Cf. In re Cree, Inc. Securities Litig.*, 333 F.Supp.2d 461, 470 (M.D.N.C. 2004) (striking certain exhibits where Plaintiffs had not "explicitly relied" on the articles in their complaint, but rather made "oblique references to media coverage" concerning the alleged fraudulent conduct). Accordingly, these exhibits will not be considered.

On the other hand, Exhibit 25 is a copy of the Dow Jones U.S. Telecommunications Index from August 14, 2001 to October 29, 2002, reflecting the general decline in the telecommunications market during the Class Period.  *See* Paper 42, Ex. 25.  Plaintiffs do not dispute that Exhibit 25 accurately reflects the slowdown in the global communications industry that Plaintiffs explicitly refer to in their complaint.

Accordingly, the court can, and will, take judicial notice of the drop in the Dow Jones Index reflected by Exhibit 25, and will decline Plaintiffs' motion to strike that exhibit. *See Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 n.4 (4th Cir. 2004) (taking judicial notice of published stock prices and broader market data without converting a motion to dismiss into a motion for summary judgment); *D.E. & J Ltd. P'ship v. Conaway*, 284 F.Supp.2d 719, 749 (E.D.Mich. 2003) (taking judicial notice of well-publicized stock prices and market trends without converting a motion to dismiss into a motion for summary judgment in a securities fraud case); *In re USEC Securities Litig.,* 190 F.Supp.2d 808, 826 n.14 (D.Md. 2002) (taking judicial notice of published New York Stock Exchange data without converting motion to dismiss into a motion for summary judgment).

## IV. **Analysis**

The individual Defendants, PwC, and CD&R have all moved to dismiss Plaintiffs' complaint on numerous grounds. The individual Defendants contend that Plaintiffs' complaint fails to plead facts giving rise to a strong inference of scienter and fails adequately to plead loss causation. PwC asserts the same arguments with respect to scienter and loss causation, and contends that Plaintiffs have not adequately pled that the

company's disclosures with respect to the value of its goodwill were false or materially misleading.   In the alternative, it asserts that Plaintiffs' federal securities claims against it are time-barred.   Lastly, CD&R argues that Plaintiffs have failed to state a claim for a primary violation of § 10(b), and accordingly, that the controlling person liability claims under § 20(a) must be dismissed as well.   *See In re Criimi Mae*, 94 F.Supp.2d at 658.

### A.   *Scienter*

#### 1.   *The Individual Defendants*

Plaintiffs allege that the individual Defendants knew, or were reckless in not knowing, that the value of the goodwill acquired from WWG and Cheetah was severely impaired, and that the company would need to take a charge against earnings. Further, Plaintiffs allege that, by reporting that Acterna's goodwill was not impaired, and thus not taking any significant goodwill charge against earnings during the Class Period, the individual Defendants overstated Acterna's earnings, which had the "cause and effect of creating in the market an unrealistically positive assessment of Acterna and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times."   Paper 28, ¶ 85.

21

First, the individual Defendants assert that Plaintiffs improperly rely on the "group pleading doctrine" to establish scienter. Under this doctrine, corporate officers and directors who are alleged to be in day-to-day control of the company may be presumed, for pleading purposes, to be collectively responsible for a company's "group published" information such as prospectuses, registration statements, annual reports, press releases and other public filings. *See In re Criimi Mae*, 94 F.Supp.2d at 657. Undoubtedly, Plaintiffs' complaint is replete with allegations that the scienter of each individual Defendant is established, in part, by virtue of his high ranking position in the company. *See* Paper 28, ¶¶ 31, 32, 34, 35, 115–17, and 139. Recognizing that Judge Blake recently rejected the application of the "group published" doctrine as "inconsistent with the particularity and specificity required by the PSLRA and Rule 9(b)," Plaintiffs, nevertheless, invite this court to apply it. *See In re Royal Ahold,* 351 F.Supp.2d at 369. Following "the sound reasoning of other district courts in this Circuit that have addressed the issue," as well as Judge Blake, the court will decline Plaintiffs' invitation. *See, e.g., In re Royal Ahold*, 351 F.Supp.2d at 369; *In re Cree,* 333 F.Supp.2d at 471; *Glaser v. Enzo Biochem, Inc.*, 303 F.Supp.2d 724, 734 (E.D.Va. 2003), *rev'd on other grounds*, 126 Fed.Appx. 593, 2005

22

WL 647745 (4th Cir. Mar. 21, 2005) (unpublished); *Smith v. Circuit City Stores, Inc.*, 286 F.Supp.2d 707, 715 (E.D.Va. 2003); *In re First Union,* 128 F.Supp.2d at 888; *In re CIENA Corp. Securities Litig.*, 99 F.Supp.2d 650, 663 n.11 (D.Md. 2000); *In re Medimmune*, 873 F.Supp. at 960-61 n.7. Accordingly, "Plaintiffs cannot claim that the individual Defendants' titles or positions at [Acterna] establish that they must have known of the alleged fraud." *In re Cree*, 333 F.Supp.2d at at 734; *see also Smith*, 286 F.Supp.2d at 715 (dismissing plaintiffs' attempt to establish defendants' scienter because of their status as senior officers, access to confidential and proprietary information, and interaction with other executives); *In re First Union*, 128 F.Supp.2d at 888 (rejecting plaintiffs' claim that "because of their positions as corporate officers, defendants must have known of the allegedly false and misleading nature of all the alleged misstatements").

Plaintiffs, however, do not rely exclusively on the group pleading doctrine to plead the individual Defendants' scienter. The complaint alleges, and Plaintiffs assert in their opposition brief, that the individual Defendants' scienter can also be established by statements from four former Acterna employees. *See* Paper 28, ¶¶ 118-21; Paper 53 at 19-21. Plaintiffs contend

that the information provided by these former employees, (identified in the complaint as W-1, W-2, W-3, and W-4), gives rise to a strong inference that the individual Defendants "had actual knowledge or [were] deliberately reckless in failing to ascertain the fact that Acterna's goodwill was overstated throughout the Class Period and that the Company was required to take a substantial charge against earnings pursuant to the requirements of FAS 142." Paper 28, ¶ 122.

First, according to W-1, a former accountant and supervisor in Acterna's Corporate Finance Department from February 1996 to October 2003, the Corporate Finance Department and PwC had "started doing the work for it [the write-off] but hadn't finished the analysis yet. We were still recalculating then. I remember because of all the work I was doing." Paper 28, ¶¶ 11, 113, 118. From these statements, Plaintiffs jump to the conclusion that "Defendants knew that Acterna would have to take a significant goodwill impairment charge in March 2002," but nevertheless "continued to represent to the investing public that its goodwill was not impaired." *Id.*, ¶ 11. However, far from confirming that Defendants "had actual knowledge that Acterna's goodwill was impaired" in March 2002, at most, Plaintiffs' allegations would demonstrate that Acterna (and PWC) was conducting the impairment tests as required by FAS 142, but

24

had not determined whether, and if so, how much, Acterna's goodwill was impaired. In other words, the alleged fact that Acterna and PWC had "started doing the work for it [the write-off] but hadn't finished the analysis yet" is not sufficient to demonstrate that Acterna and PWC had concluded that Acterna's goodwill was impaired. And, it would demonstrate even less that any of the individual Defendants knew that Acterna's goodwill was impaired. In fact, it merely demonstrates that as of that time, no conclusion had been reached, as evidenced by W-1's own statement that they were "still recalculating." Noticeably absent from the complaint is an allegation that *once the analysis was complete*, Acterna and PWC concluded that there was an impairment to goodwill, that the individual Defendants were aware of that conclusion, and that they, nevertheless, consciously misrepresented in their subsequent statements that it was not impaired. In sum, Plaintiffs' allegations with respect to what W-1 can confirm are not sufficient to demonstrate that when the company ultimately issued its subsequent reports, the statements regarding goodwill contained therein were either false or misleading, and, even if they were false, that the individual Defendants acted with a conscious or

25

reckless effort to defraud shareholders.[8]   *See Keeney,* 306 F.Supp.2d at 538.

Moreover, not one of the Plaintiffs' confidential witnesses provides any information about how the individual Defendants were involved in any alleged schemes to misrepresent the value of Acterna's goodwill or, assuming such a scheme existed, how each individual Defendant knew of the alleged fraud.   *See In re Cree,* 333 F.Supp.2d at 474-75 (finding that although some of the plaintiffs' claims regarding improper business practices may have been alleged with sufficient particularity to raise an inference that they occurred, "none of the allegations raises a strong inference that [the Defendant officers and directors] acted with scienter" because "[n]ot one of Plaintiffs' confidential witnesses provides any information about how the individual Defendants were involved in the alleged schemes or how each Defendant knew of the purported fraud").   As discussed above, nothing W-1 can allegedly provide sheds any light on what

---

[8] Furthermore, because Plaintiffs allege that W-1 can confirm that "by March 2002 Acterna and PwC had determined that Acterna's goodwill was impaired," the purported facts that W-1 can confirm bear only on the alleged misstatements made after March 2002.   Thus, W-1's allegations do nothing to raise an inference of scienter with respect to any defendant for any alleged misstatements made prior to March 2002.   *See* Paper 28, ¶¶ 50-64.

the individual Defendants knew, or were reckless in not knowing, about the impairment of goodwill during the Class Period.

The allegations regarding the information that W-3 and W-4 can provide also do not support a strong inference of scienter as to each individual Defendant.  Plaintiffs allege that W-3, a senior Financial Analyst who worked in Acterna's North Carolina office, "was aware of longstanding concerns regarding the valuation of Cheetah's assets" and that he "recalled discussions regarding the goodwill associated with the Cheetah acquisition during which *Acterna insiders* stated that the goodwill was overstated from the time of the acquisition."  Paper 28, ¶ 13 (emphasis added).  Plaintiffs allege that W-3's assessment of the Cheetah acquisition is corroborated by W-4, a former Manager of Acterna's Professional Services Department, who described Cheetah as a "negative acquisition" that was "completely worthless" and a "liability" from the start.  *Id*.  These allegations are insufficient to support an inference of scienter for several reasons.  First, regardless of what W-3, W-4, or other "Acterna insiders" were aware of with respect to the Cheetah acquisition, Plaintiffs do not allege any facts as to what the individual Defendants knew and when.  For example, W-3 does not allege when the "discussions . . . regarding the Cheetah acquisition" took place, and more importantly, whether

any of the individual Defendants were present during these
discussions, or how else they may have been privy to them.
Merely alleging that "Acterna insiders" knew that the goodwill
associated with the Cheetah acquisition was overvalued is too
general to show that any individual Defendant had knowledge.
*Cf. In re Cree*, 333 F.Supp.2d at 475 (stating that the
plaintiffs' claim that the fraud "was well-known within [the
company]" was too general to show that the defendant officers
and directors had knowledge of the alleged fraud); *In re First
Union*, 128 F.Supp.2d at 886 (stating that "at a minimum," the
PSLRA "requires that . . . for each alleged misstatement or
omission, plaintiffs must plead facts concerning, for example,
when each defendant or other corporate officer learned that a
statement was false, how that defendant learned that the
statement was false, and the particular document or other source
of information from with the defendant came to know that the
statement was false") (citing *In re Advanta Corp. Securities
Litig.*, 180 F.3d 525, 534 (3rd Cir. 1999) (stating that the PSLRA
requires plaintiffs to plead "who, what, when, where, and how"
in order to establish scienter)).

The closest Plaintiffs come to making an allegation that
would support an inference of scienter as to any of the
individual Defendants is their assertion that W-2 can confirm

that Kline, Woodbury, and Ratliff were "intimately involved in
all aspects of the WWG acquisition," and that they "had primary
responsibility for analyzing the value of the assets acquired
from WWG, including valuation of acquired goodwill."  Paper 28,
¶ 12.   However, this allegation falls short of meeting the
heightened pleading requirement for demonstrating scienter for
several reasons.  First, this allegation speaks to the knowledge
of these individual Defendants with respect to WWG, and the
valuation of its goodwill, at the time of acquisition, i.e., May
2000.  Whatever their roles might have been at that time, W-2's
information does not demonstrate that they had any knowledge
regarding the valuation of its goodwill during the Class
Period–August 14, 2001 to October 29, 2002–when they were
allegedly "mis[leading] Plaintiffs and the investing public."
*Id.*, ¶ 8.   Moreover, with respect to the falsity of the
statements, W-2 does not provide any specific facts to support
the conclusory allegations that the statements regarding
goodwill released during the Class Period were in fact false or
misleading.  And, even assuming the statements were false, W-2
does not provide with any particularity facts giving rise to a
strong inference that when Kline, Woodbury, and Ratliff signed
the various filings, they either knew that the statements
regarding the impairment of goodwill were false, or were

29

reckless in not knowing.  *See In re e.spire Communications, Inc.*
*Securities Litig.*, 127 F.Supp.2d 734, 741 (D.Md. 2001) ("With
respect to each of [the] statements, the Complaint fails to
adequately explain why each statement was misleading and also
fails to identify with particularity specific facts which would
give rise to a strong inference that each named defendant acted
with scienter."); *In re Boston Technology, Inc. Securities*
*Litig.,* 8 F.Supp.2d 43, 57 (D.Mass. 1998) ("A 10b-5 plaintiff
must allege 'details of [defendants'] alleged fraudulent
involvement,' including specifics as to what defendants had
knowledge of and when.  To satisfy this requirement, complaints
typically identify internal reports, memoranda, or the like, and
allege both the contents of those documents and defendants
possession of them at the relevant time.") (internal citations
and footnote omitted).  The allegations here simply do not
support a "strong inference" that the individual Defendants
"acted with fraudulent intent or that their actions evince an
'extreme departure' from ordinary care." *Keeney*, 306 F.Supp.2d
at 539; *see also Phillips*, 190 F.3d at 621.

Plaintiffs also contend that, in addition to the allegations
supported by the four former employees, the motives of the
individual Defendants to commit securities violations are
additional factors supporting a strong inference of scienter.

"In order to demonstrate motive, a plaintiff must show 'concrete benefits that could be realized by one or more of the false statements and wrongful disclosure alleged.'"  *Phillips*, 190 F.3d at 621 (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2nd Cir. 1994)).  The Fourth Circuit has made clear that allegations, like the ones asserted here, that merely charge that executives committed fraud to prolong the benefits they hold or to retain an executive position do not, in themselves, raise a strong inference of scienter.  *Phillips*, 190 F.3d at 622; *In re e.spire,* 127 F.Supp.2d at 734; *In re Criimi Mae*, 94 F.Supp.2d at 661.  Recognizing that the scienter inquiry is not to be restricted "by focusing on specific categories of facts, such as those relating to motive and opportunity," facts (or lack of such facts) demonstrating motive nevertheless remain important in determining whether the factual allegations "collectively establish a strong inference of scienter."  *Ottmann*, 353 F.3d at 345–46.  Moreover, the weight accorded to those allegations should depend on the circumstances of each case.  *Id*.  Here, where Plaintiffs' allegations purporting to demonstrate the individual Defendants' scienter are slight at best, allegations suggesting a motive to engage in fraudulent activities would need to be particularly strong to have any significance.  *Cf. In re e.spire*, 127 F.Supp.2d at 744

31

(suggesting the corollary that "when a defendant's motive to commit securities fraud is not readily apparent from a complaint, the plaintiff faces a more stringent standard for establishing fraudulent intent and must state with particularity facts giving rise to a strong inference of fraud based on conscious behavior or severe recklessness").  However, Plaintiffs' allegations of motive are in the vein of general, conclusory allegations about the desire of the individual Defendants to retain their positions.  Because such allegations of motive generally are deemed insufficient, they should be accorded little, if any, weight and simply do not bolster Plaintiffs' contention that the individual Defendants acted with the requisite scienter.

Moreover, "[i]f a motive to commit fraud can be a relevant [although not dispositive] circumstance supporting a claim of scienter, it would seem that an inability to show motive can be a relevant circumstance indicating the lack of scienter." *Cutsforth v. Renschler*, 235 F.Supp.2d 1216, 1250 (M.D.Fla. 2002).  Here, Plaintiffs have not alleged any concrete benefits that could be realized by the alleged false statements.  For example, Plaintiffs do not allege that the individual Defendants sold any stock during the class period, thereby taking advantage of their fraudulent scheme to artificially inflate the company's

share price. *See Phillips*, 190 F.3d at 622 ("To support a claim of motive based on the benefit a defendant derives from an increase in the value of his holdings, a plaintiff must demonstrate some sale of 'personally-held stock' or 'insider trading' by the defendant.").   The absence of any allegations that any individual Defendant sold any of his personally held stock at inflated prices "plainly undermines the contention regarding motive." *Cutsforth,* 235 F.Supp.2d at 1250 (citing *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 814 (2nd Cir. 1996) (concluding "that the sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent," and "the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive")); *see also Keeney*, 306 F.Supp.2d at 535-36 (finding that plaintiffs' complaint did not plead a strong inference of scienter in a "fraud on the market" case where defendants did not make any sales of their shares during the class period).   Thus, where allegations of insider trading or selling of personally-held stock "may strengthen an inference of scienter," *In re MicroStrategy, Inc. Securities Litig.*, 115 F.Supp.2d 620, 643 (E.D.Va. 2000), "there should be a negative inference regarding

33

scienter as a result of the plaintiffs' unsuccessful attempt to demonstrate motive." *Cutsforth*, 235 F.Supp.2d at 1250; *see also, e.g., In re e.spire,* 127 F.Supp.2d at 743 (concluding that "the trades relied upon by the plaintiffs were not made in quantities which were suspicious enough to support a strong inference of scienter"); *In re CIENA,* 99 F.Supp.2d at 663 (finding that "the fact that the individual defendants sold so little stock could be construed as negating the inference that there was fraud"). Plaintiffs, therefore, have not adequately alleged facts demonstrating that the individual Defendants had a motive to engage in securities fraud. This shortfall, coupled with the weak inferences to be drawn from Plaintiffs' other allegations, undermines Plaintiffs' assertion that the individual Defendants acted with the required state of mind. Thus, the absence of any allegations establishing a motive for the individual Defendants to engage in securities fraud cuts against Plaintiffs' argument.

Finally, the company's full disclosure of the negative, and, in Plaintiffs' own words, "abysmal financial results" during the time leading up to and throughout the Class Period further militates against an inference of scienter on the part of the individual Defendants. *See Phillips*, 353 F.3d at 348 (finding that although a truthful disclosure that reflects negatively on

34

a  company  may  not  be  adequate  to  correct  an  earlier
misstatement,  "it  nonetheless  militates  against  a  finding  that
[defendants]  acted  with  a  culpable  state  of  mind");  *In  re
Bellsouth  Corp.  Securities  Litig.*,  355  F.Supp.2d  1350,  1375
(N.D.Ga.  2005)  ("Defendants'  reasonable  conduct  and  substantial
public  disclosures  do  not  demonstrate  highly  unreasonable
conduct  which  is  an  extreme  departure  from  the  standards  of
ordinary  care.");  *Cutsforth*,  235  F.Supp.2d  at  1261  (finding
disclosures  throughout  the  Class  Period  of  unfavorable
information  about  the  company  weighed  against  an  inference  of
scienter  on  the  part  of  the  individual  officers).   Here,  it  is
undisputed  that  leading  up  to  and  throughout  the  Class  Period,
Acterna's  public  filings  fully  disclosed  the  financial  problems
the  company  was  experiencing,  and,  in  fact,  attributed  some  of
those  problems  to  the  WWG  and  Cheetah  acquisitions.[9]

---

[9] For example, on November 14, 2000, Acterna filed its Form
10-Q for the period ending September 30, 2000 ("2001 2.Q. 10-
Q"), the second quarter for the 2001 fiscal year, but the first
quarterly report following consummation of the WWG and Cheetah
acquisitions.  *See* Paper 42, Ex. 2.  That filing made clear that
the two acquisitions had an initial negative impact on Acterna's
financial condition, stating that "[a]s a result of the
substantial indebtedness incurred in connection with the WWG
Merger and the Cheetah acquisition, the Company expects that its
interest expense will be higher and will have a greater
proportionate impact on net income in comparison to prior
periods."  *Id*. at 12.  It also reported an increase in operation
expenses "primarily as a result of the acquisition of WWG, which
(continued...)

In Acterna's 2002 1.Q. 10-Q, filed on August 14, 2001 and identified by Plaintiffs as commencing the Class Period, the company disclosed that it had mounting liquidity needs "primarily resulting from debt service on the substantial indebtedness incurred in connection with the WWG Merger and from the funding of working capital and capital expenditures." Paper 42, Ex. 5 at 20.  Although net sales were up that quarter "primarily as a result of the WWG Merger," *see id*. at 19, the company also disclosed that it had $1.1 billion of debt and that it could not provide any assurances that it could meet its debt service obligations, specifically warning that its "future operating performance and ability to [meet its debt service obligations] will be, among other things, subject to future economic conditions and to financial, business and other factors, many of which are beyond the Company's control." *Id*. at 20.

---

[9](...continued)
ha[d] a higher cost structure than the Company ha[d] had historically." *Id*. at 17.  In addition, the company disclosed that it had an operating loss of $26.8 million for the quarter, as compared to income of $21.6 million for the same period the prior year because of the "additional amortization expense, the amortization of the inventory step-up from the acquisitions of WWG and Cheetah, as well as expenses relating to the integration of WWG with the Company's communications test segment and the writeoff of in-process research and development costs." *Id*. at 18.

For the following four quarters prior to the end of the Class Period, Plaintiffs' own complaint demonstrates that Acterna fully disclosed the declining sales, orders, and revenue, and increasing net losses that the company was experiencing.  *See* Paper 28, ¶¶ 58-79.  Although it reported throughout the Class Period that it had tested its goodwill pursuant to FAS 142, finding that it was not impaired, the company explicitly warned on two separate occasions that due to the industry slowdown, goodwill might ultimately be assessed as impaired.  For example, in its 2002 3.Q 10-Q, the company warned that the "current global economic downturn has further impacted a previously existing downturn in the Company's communications test segment," and that "[i]f the Company's expectations as to future results are diminished significantly, goodwill may be impaired and any resulting noncash impairment charge may have an adverse effect on results of operations."  Paper 42, Ex. 13 at 4-5, 9.  Moreover, in the 2003 1.Q 10-Q, the last 10-Q filed within the Class Period, although the company determined that its goodwill was not impaired for that period, it stated that as result of the continued industry slowdown, it would "continue to assess the value of goodwill for impairment on a quarterly basis

37

and can provide no assurance that an impairment adjustment will not be necessary in the future." *Id.*, Ex. 20.[10]

In light of the company's full disclosure of its steadily declining financial conditions, its pressing liquidity needs and debt load brought on by the WWG and Cheetah acquisitions, as well as its express warnings about the possibility of a future impairment to goodwill, Plaintiffs' assertion that the individual Defendants consciously or recklessly "misled Plaintiffs and the investing public regarding Acterna's business condition, financial stability and the success of its acquisition program and strategy" is unavailing. *See* Paper 28, § 8. Simply put, Acterna's substantial public disclosures, which were replete with unfavorable financial information and express warnings about the possibility of writing off goodwill, do not give rise to a strong inference of intentional or reckless misconduct on the part of the individual Defendants. *See In re Bellsouth,* 355 F.Supp.2d at 1376 ("That Defendants generally disclosed the troubles in its Latin American operations urges against an across the board inference of

---

[10] It was the very next quarter, in fact, that Acterna, "[a]s a result of the increasingly severe market conditions, . . . revised and reduced its long term financial forecast," and recorded an impairment charge of $374.2 million. *See id.*, Ex. 21 at 9-10.

scienter, as does the fact Defendants, and not some outside entity, initiated the inquiry into the impairment of the goodwill that resulted in the [$1.277 billion] write down.").

In sum, for the reasons discussed above, Plaintiffs' allegations fail to "collectively establish a strong inference of" intentional or reckless behavior on the part of the individual Defendants. *See Ottmann*, 353 F.3d at 345-46. Accordingly, Plaintiffs' complaint does not meet the scienter pleading requirements under the PSLRA, and for this reason the claims against the individual Defendants must be dismissed. 15 U.S.C. § 78u-4(b)(2)-(3).

### 2. *PricewaterhouseCoopers LLP (PwC)*

Defendant PwC has also moved to dismiss Plaintiffs' complaint on the grounds that their allegations against PwC do not raise a strong inference that PwC acted with the requisite scienter. For many of the same reasons discussed above with respect to the scienter of the individual Defendants, Plaintiffs' allegations fail to support a strong inference that PwC acted with scienter.

First, Plaintiffs allege that "W-1 establishes that at least as of March 2002 PwC had actual knowledge that the Company's goodwill was overstated and, as a result, PwC knew Acterna's financial statements [after that period] were not prepared in

39

accordance with GAAP." Paper 28, ¶ 109.  Plaintiffs then recite
a host of Generally Accepted Accounting Standards ("GAAS") PwC
allegedly failed to observe.  *Id.*, ¶ 110, 112.  As discussed
above, however, to conclude that PwC had actual knowledge of an
impairment to goodwill based on W-1's information would be an
unreasonable inferential leap.  According to W-1, Acterna's
Corporate Finance Department and PwC had "started doing the work
for it [the write-off] but hadn't finished the analysis yet.  We
were still recalculating then.  I remember because of all the
work I was doing."  Paper 28, ¶¶ 11, 113, 118.  From these
statements, Plaintiffs jump to the conclusion that "Defendants
knew that Acterna would have to take a significant goodwill
impairment charge in March 2002," but nevertheless "continued to
represent to the investing public that its goodwill was not
impaired."  *Id.*, ¶ 11.  However, far from confirming that PwC
"had actual knowledge that Acterna's goodwill was impaired" in
March 2002, at most, Plaintiffs' allegations demonstrate that
PwC and Acterna were conducting the required impairment
analysis, but had not determined whether, and if so, how much,
Acterna's goodwill was impaired.  In other words, the fact that
Acterna and PWC had "started doing the work for it [the write-
off] but hadn't finished the analysis yet" does not sufficiently
demonstrate that PWC had concluded that Acterna's goodwill was

impaired.  In fact, it merely demonstrates that as of that time, no conclusion had been reached, as evidenced by W-1's own statement that they were "still recalculating."  As mentioned above, absent from the complaint is an allegation that once the analysis was complete, PWC had concluded that there was an impairment to goodwill, and that it, nevertheless, allowed the company to issue the subsequent statements that it was not impaired.  In short, Plaintiffs' allegations with respect to what W-1 can confirm are not sufficient to demonstrate that when the company ultimately issued its subsequent reports, including the 2002 Annual 10-K Report, the statements regarding goodwill contained therein were either false or misleading, and, even if they were false, that PwC acted with either actual knowledge of their falsity or a high degree of recklessness.

Plaintiffs also allege PwC "knew or was reckless in not knowing the possibility of fraud due to Acterna's declining revenues in its key communications test division, but PwC . . . . deliberately failed to investigate whether the decline in revenues and orders for communications test products and services would adversely impact the carrying value of the goodwill that Acterna acquired from the WWG and Cheetah acquisitions."  Paper 28, ¶ 111.  Plaintiffs allege PwC "deliberately or recklessly ingor[ed] such red flags" in

41

violation of several GAAS provisions. *Id.*, ¶ 112.  In order for recklessness to provide a strong inference of scienter as defined by the PSLRA, Plaintiffs "must allege facts demonstrating that 'the accounting practices were so deficient that the audit amounted to no audit at all or that . . . no reasonable accountant would have made the same decisions if confronted with the same facts.'"  *In re Royal Ahold*, 351 F.Supp.2d at 385 (quoting *Zucker v. Sasaki*, 963 F.Supp. 301, 307 (S.D.N.Y. 1997)) (internal quotations and citations omitted). "The mere misapplication of accounting principles [such as GAAP and GAAS] by an independent auditor does not establish scienter."  *Id.* (quotation and internal footnotes omitted). Rather, Plaintiffs must instead allege facts demonstrating that "the nature of those violations was such that scienter is properly inferred."  *In re MicroStrategy*, 115 F.Supp.2d at 651. Violations that would contribute to a finding of scienter may include the auditor's reckless disregard of "red flags," or known risk factors that the auditor should have heeded and in response modified its audit process or opinion.  *In re Royal Ahold*, 351 F.Supp.2d at 386.

Plaintiffs offer no support for their allegations that PwC "failed to investigate" whether the decline in revenues and sales would adversely impact goodwill, or that it ignored "red

flags" associated with Acterna's declining financial condition that could result in an impairment to goodwill.   Rather, Acterna's public filings suggest otherwise.   In the company's fiscal 2002 Annual 10-K, the first public filing after Plaintiffs allege PwC "had actual knowledge" of the impaired goodwill, Acterna reported that:

> During the fourth quarter of fiscal 2002, as a result of the substantial declining financial performance within the communications test segment [which includes WWG and Cheetah] and resulting reduced expectations for future revenues and earnings, management performed an assessment of the carrying values of long-lived assets within the communications test segment. This assessment, based on estimated future cash flows of the assets, discounted to arrive at a value today, quantified the impairment of acquired intangible assets (principally core technology). As a result, a charge of $151.3 million was recorded during the fourth quarter of fiscal 2002.

Paper 42, Ex. 16 at C-20; *see also id.* at B-10 (explaining that an assessment of long-lived assets within the communications test segment revealed an impairment, resulting in a recorded charge of $151.3 million).   Acterna then stated that it had "completed its transitional impairment test of goodwill during the year ended March 31, 2002 for all reporting units required under FAS 142 . . . and determined that goodwill was not impaired."   *Id.* at C-21.   Given that FAS 142 specifically

provides that "[i]f goodwill and another asset (or asset group) of a reporting unit are tested for impairment at the same time, the other asset (or asset group shall be tested for impairment before goodwill," and if "the asset group was impaired, the impairment loss would be recognized prior to goodwill being tested for impairment," Plaintiffs' allegations that the company, and PwC as its outside auditor, failed to adhere to FAS 142 fall flat.   They offer nothing to suggest that once the company (and presumably PwC) had tested and determined that a substantial impairment charge and write-off for long-lived assets was required, the company then mistakenly concluded no impairment to its goodwill existed.

Moreover, in its audit opinion included in the Company's 2002 10-K, PwC reiterated that "[a]s discussed in Note B to the consolidated financial statements, the Company has significant liquidity needs." *Id*. at C-2; *see also* Paper 28, ¶ 107.  Note B contains numerous warnings and disclosures regarding Acterna's significant reductions in revenues, earnings, and operations resulting from the economic "downturn within the telecommunications sector." *Id*. at C-8 to C-9.  Additionally, as discussed above, the company explicitly warned on two separate occasions that due to the industry slowdown, goodwill might ultimately be assessed as impaired. *See* Paper 42, Ex. 13

at 4-5, 9; Ex. 20 at 8.  These observations demonstrate that, far from recklessly disregarding "red flags," or "failing to investigate" the impact of Acterna's declining financial condition on its goodwill, PwC was acutely aware of the declining financial conditions of the company, as it explicitly recognized, as well as the need that a future adjustment to the company's goodwill might become necessary.

Plaintiffs also argue that the magnitude of the misstatement raises a strong inference of PwC's scienter.  Paper 54 at 22. However, unlike many of the company defendants in the cases Plaintiffs cite, Acterna did not restate its earnings or correct a previous valuation of goodwill it had reported in error in prior filings.  Thus, unlike in those cases, Plaintiffs cannot merely rest on the conclusory allegation that Acterna's goodwill representations prior to its October 30, 2002 press release, in which it announced a $388 million charge for goodwill and other asset impairment, were false or misleading.  Rather, it must provide sufficient facts to give rise to an inference that when Acterna represented during the Class Period that there was no impairment to goodwill, that, in fact, there was an impairment. Only then would Defendants' statements to the contrary be false or misleading.

Plaintiffs point to Acterna's October 30, 2002 press release announcing its financial results for the second quarter of 2003 as if it constituted an earnings restatement, or corrective disclosure, of its financial numbers from previous quarters. As such, they contend that it was an admission that its earlier statements were misleading and argue that the size of the write-off demonstrates PwC's scienter. *See* Paper 28, ¶ 14; Paper 54 at 22-24. To support this argument, Plaintiffs cite to such cases as *In re Royal Ahold*, 351 F.Supp.2d at 342*, In re MicroStrategy*, 115 F.Supp.2d 636, and *In re WorldCom, Inc. Securities Litig.*, 2003 WL 21488087 (S.D.N.Y. June 25, 2003). *See also In re WorldCom, Inc. Securities Litig.*, 352 F.Supp.2d 472 (S.D.N.Y. 2005). However, in each of these cases, the defendants restated significant financial numbers it had admitted to reporting in error. *See In re Royal Ahold*, 351 F.Supp.2d at 342 ($1.1 billion restatement of earnings, $24.8 billion reduction in revenue); *In re MicroStrategy*, 115 F.Supp.2d at 636 (reported net income of $18.9 million over a three year period restated to reflect an actual net loss of more than $36 million and overstated revenues of $66 million); *In re WorldCom*, 352 F.Supp.2d at 476 (restating approximately $76 billion in adjustments). Although "the fact that a restatement of financials occurred is not sufficient to raise a strong

46

inference of scienter[,] . . . when the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter." *In re MicroStrategy*, 115 F.Supp.2d at 634-35; *see also In re Atlas Air Worldwide Holdings, Inc. Securities Litig.*, 324 F.Supp.2d 474, 486 (S.D.N.Y. 2004) ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made."). Here, Acterna's October 30, 2002 press release is not a restatement or correction of its financial numbers from previous quarters, but merely a report of its financial numbers for the second fiscal quarter of 2003. With respect to the goodwill impairment charge, the company explained in its 10-Q filed with the Exchange Commission:

> During the quarter ending September 30, 2002, the market conditions with the communications test business experienced further declines. The Company observed a more pronounced deterioration in customer bookings as well as further reductions in customer spending on telecommunications products.
>
> As a result of the increasingly severe market conditions, the Company revised and reduced its long term financial forecast. Based on this revision of the long-term

> outlook, the Company, assisted by independent valuation consultants, completed an assessment of the carrying amount of goodwill in the communications test segment, as required by SFAS No. 142, "Goodwill and Other Intangible Assets". The results of the impairment analysis, which were derived by utilizing, among other methods, a discounted cash flow analysis and an analysis of other market comparables, indicated the carrying amount of goodwill within the communications test segment exceeded its estimated fair value. Accordingly, the Company recorded an impairment charge of $374.2 million. This charge was recorded within the communications test segment and has been included in the impairment charge in the unaudited Statements of Operations.

Paper 42, Ex. 21 at 9-10.   Far from the sort of financial restatement or corrective disclosure in *WorldCom*, *Royal Ahold*, or *MicroStrategy*, Acterna's October 30, 2002 press release and subsequent 10-Q filing evidence little, if anything, about its financial statements during the Class Period.   It certainly is not an acknowledgment, as Plaintiffs allege, "that Acterna's Class Period financial statements concerning unimpaired goodwill were false and misleading."   Paper 28, ¶ 14; *cf. In re Atlas Air*, 324 F.Supp.2d at 487 ("The fact that Atlas announced [in 2002] the need to significantly adjust its reported financials for 2000 is sufficient to indicate that the company's reported financials for the first and second quarter of that year were

materially false."). And, even less so is the write-off a fact raising a strong inference of PwC's scienter.

Plaintiffs also argue that the alleged violations of GAAP, when coupled with other circumstantial evidence of fraud, give rise to a strong inference of PwC's scienter. *See, e.g., In re Microstrategy*, 115 F.Supp.2d at 650-51. However, as stated above, the "mere misapplication of accounting principles . . . by an independent auditor does not establish scienter." *In re Royal Ahold*, 351 F.Supp.2d at 386 (quoting *Zucker*, 963 F.Supp. at 307). As the *MicroStrategy* court stated:

> More is required; specifically, a plaintiff must also allege facts tending to show that "the accounting practices were so deficient that the audit amounted to no audit at all or that no reasonable accountant would have made the same decisions if confronted with the same facts." *Zucker*, 963 F.Supp. at 307 (quotations omitted). In other words, a plaintiff alleging an auditor's scienter cannot meet the PSLRA pleading standard simply by alleging that the auditor violated GAAS or other pertinent accounting and auditing principles in performing an audit and other services--specifically, by solely relying on the inferentially ambiguous fact that an audit did not conform to GAAS; instead, a plaintiff must allege other facts indicating that the nature of those violations was such that scienter is properly inferred. In sum, to meet the PSLRA pleading burden, a plaintiff must allege facts that place the GAAS violations in a context that "paint a portrait of an audit so reckless that a jury could infer an intent to defraud." *Jacobs v. Coopers &*

> *Lybrand*, No. 97-CIV-3374 (RPP), 1999 WL
> 101772, at *14 (S.D.N.Y. March 1, 1999).

*In re MicroStrategy*, 115 F.Supp.2d at 651 (internal footnote omitted).

Plaintiffs first contend that the confidential witness statements "paint a portrait" of a reckless audit by PwC that raises an inference of an intent to defraud. *See* Paper 54 at 21. However, as discussed above in some detail, the statements by the confidential witnesses provide little, if any, support for an allegation that PwC had actual knowledge or was reckless in failing to ascertain that Acterna's goodwill was significantly impaired. Moreover, the argument that here, like in *In re MicroStrategy*, the magnitude of the misstatement and scope of the fraud "lend further probative weight to Plaintiffs' allegations that the GAAP violations in this case raise a strong inference of scienter" is unpersuasive in light of the fact that Acterna, unlike MicroStrategy, did not restate previously reported financial numbers that it admitted were initially reported in error. *See In re MicroStrategy*, 115 F.Supp.2d at 624-27, 651. Moreover, not only were the massive restatements critical to that court reaching the conclusion that a strong inference of the defendant's scienter had been raised, but the fact that the accounting violations which resulted in such a

50

large restatement involved the violation of "relatively straightforward accounting principles" was important as well. *Id.* at 652. Here, Plaintiffs admit in their opposition papers that FAS 142, the main accounting principle that Defendants allegedly either failed altogether to recognize or to apply properly, calls for a "complicated analysis" in determining the impairment of goodwill. *See* Paper 54 at 13.[11]   Accordingly, Plaintiffs' reliance on *In re MicroStrategy* to support their assertion that alleged violations of GAAP, coupled with circumstantial evidence of fraud such as the magnitude of the restatement and the simplicity of the accounting violations alleged, is misplaced.

In sum, Plaintiffs' allegations do not support a strong inference that PwC knew or recklessly disregarded that Acterna's financial statements were materially false or misleading due to the purported overvaluation of the company's goodwill.   Nor do

---

[11] Moreover, even the article that Plaintiffs' cite in their opposition to explain the effect of FAS 142 suggests that its implementation is not straightforward. *See* Paper 54 at 3-5.  In it, the authors state that the illustration they provide of the impairment testing process required under FAS 142 "does not address the complications faced when estimating the required fair values" of the various operation segments, or reporting unit, a company is testing. *See* Ronald J. Huefner & James A. Largay III, *The Effect of the New Goodwill Accounting Rules on Financial Statements*, The CPA Journal (Oct. 2004), *available at*, http://www.nysscpa.org/cpajournal/2004/1004/essentials/p30.htm (last visited July 22, 2005).

they support the conclusory allegation that "had PwC conducted its audit in accordance with GAAS, it would have discovered the massive overvaluation of the Company's goodwill, the Company's failure to adhere to and comply with FAS 142, and the Company's consequent overstatement of earnings during the reporting periods in which it failed to timely write down its goodwill." Paper 28, ¶ 109.  Plaintiffs' allegations, taken together, do not give rise to a strong inference that when PwC audited Acterna's 2002 financial statements and issued its opinion, "it recklessly disregarded or outright ignored the risk of falsity of [those] financial statements."  *In re Oxford Health Plans, Inc. Securities Litig.,* 51 F.Supp.2d 290, 295 (S.D.N.Y. 1999). Because Plaintiffs have failed to "state with particularity facts giving rise to a strong inference that [PwC] acted with the required state of mind," they have failed to state a claim for relief against PwC under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### B.   *Loss Causation*

Even if Plaintiffs had sufficiently alleged that one of the individual Defendants and/or PwC had acted with the requisite scienter, the complaint still must be dismissed because it fails to include any allegation to support the essential element of loss causation.   In any private action arising under the

Securities and Exchange Act, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4). As the Supreme Court has recently stated, the PSLRA "makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, *plaintiffs adequately allege* and prove the traditional elements of causation and loss."  *Dura Pharms.*, 125 S.Ct. at 1633 (emphasis added).[12]  Accordingly, "[a] direct or proximate relationship between the loss and the misrepresentation must be shown."  *Gasner v. Bd. of Supervisors of the County of Dinwiddie, Va.*, 103 F.3d 351, 360 (4th Cir. 1996).

Courts have generally bifurcated the causation pleading requirement, requiring that a plaintiff allege facts establishing both "transaction causation" and "loss causation."  *See, e.g., Gasner,* 103 F.3d at 360; *see also, e.g., Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 172 (2nd Cir. 2005);

---

[12] In addition to the text of the PSLRA, the legislative history of the Act also makes clear that this is a pleading requirement: "The Conference Committee also requires the plaintiff *to plead* and then prove that the misstatement or omission alleged in the complaint actually caused the loss incurred by the plaintiff in new Section 21D(b)(4) of the 1934 Act."  H.R.Conf.Rep. No. 104-369, at 41 (1995) (emphasis added).

*Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3rd Cir. 2000);
*Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir.
1997). Thus, "[i]n a suit brought under [§ 10(b) and] Rule
10b-5, the plaintiff must show both *loss causation*--that the
misrepresentations or omissions caused the economic harm--and
*transaction causation*--that the violations in question caused
the [plaintiff] to engage in the transaction in question."
*Gasner*, 103 F.3d at 360 (internal quotations omitted) (emphasis
in original); *Keeney*, 306 F.Supp.2d at 541; *Morris v. Wachovia
Securities, Inc.*, 277 F.Supp.2d 622, 632 (E.D.Va. 2003) ("It is
settled that causation under federal securities laws is
two-pronged: a plaintiff must allege both transaction causation,
i.e., that but for the fraudulent statement or omission, the
plaintiff would not have entered into the transaction; and loss
causation, i.e., that the subject of the fraudulent statement or
omission was the cause of the actual loss suffered.").

Transaction causation, another way of describing reliance,
requires only an allegation that the misrepresentations or
omissions caused the plaintiff to engage in the transaction in
question. *See, e.g., Lentell*, 396 F.3d at 172; *Robbins,* 116
F.3d at 1447; *D.E. & J Ltd. P'ship,* 284 F.Supp.2d at 747. "As
such, transaction causation is akin to actual or 'but for'
causation." *Robbins*, 116 F.3d at 1447. Here, Defendants do not

dispute that Plaintiffs have adequately alleged transaction causation for a fraud on the market case, but only that they have not and cannot allege loss causation.

"Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *Lentell*, 396 F.3d at 172 (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2nd Cir. 2003)); *see Dura Pharms.*, 125 S.Ct. at 1631 (defining loss causation as a "causal connection between the material misrepresentation and the loss"). To establish loss causation, "a plaintiff must show 'that the untruth was in some reasonably direct, or proximate, way responsible for his loss.'" *Robbins*, 116 F.3d at 1447 (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375 (1983)). Put another way, a plaintiff must show that "the misrepresentation touches upon the reasons for the investment's decline in value." *Huddleston*, 640 F.2d at 549.[13] Accordingly, "'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the

---

[13] In an unpublished opinion, the Fourth Circuit cited favorably to *Huddleston*, stating that "the relevant inquiry is whether the misstatement, in some reasonably direct way, 'touches upon' the reason for the investment's decline in value." *Carlton v. Franklin*, 911 F.2d 721, 1990 WL 116788, at *4 (4th Cir. Aug. 2, 1990) (per curiam).

cause of the actual loss suffered,' i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173 (internal citation omitted) (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2nd Cir. 2001)); *see also Semerenko*, 223 F.3d at 185 (stating in a fraud on the market case alleging artificially inflated share prices, "[w]here the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation").

Here, Plaintiffs allege:

> As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, . . . the market price of Acterna's stock was *artificially inflated* during the Class Period. In ignorance of the fact market prices of Acterna's publicly-traded common stock were *artificially inflated*, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, *Plaintiffs and the other members of the Class acquired Acterna common stock during the Class Period at artificially high prices and were damaged thereby.*

56

. . . .

> As a direct and proximate result of
> Defendants' wrongful conduct, Plaintiffs and
> the other members of the Class suffered
> damages in connection with their respective
> purchases and sales of the Company's common
> stock during the Class Period.

Paper 28, ¶¶ 141, 144 (emphasis added).  Defendants contend that
these specific allegations, as well as others throughout the
complaint, do not adequately allege loss causation because they
merely allege that Defendants' purported misstatements and/or
omissions artificially inflated the value of Acterna's stock
price, but fail to allege any economic loss proximately caused
by Defendants.  Plaintiffs counter that the Defendants' argument
"disregard[s] Plaintiffs' unequivocal allegations that
Defendants' false and misleading statements concerning the value
of Acterna's acquired goodwill – which was worthless – and its
adherence to FAS 142, caused the price of Acterna's stock to be
artificially inflated throughout the Class Period."  Paper 53 at
25.  Plaintiffs urge the court to follow the precedents of the
Eighth and Ninth Circuits with respect to pleading loss
causation, which merely require pleading that the price at the
time of purchase was overstated and sufficient identification of
the cause.  *Id*. at 26.

It is now abundantly clear, however, that plaintiffs cannot satisfactorily allege loss causation simply by alleging that they purchased securities at artificially inflated prices.  In *Dura Pharmaceuticals*, the Supreme Court unanimously rejected the Ninth Circuit's permissive pleading standard for loss causation. 125 S.Ct. at 1629.  In that case, the plaintiffs alleged, similar to Plaintiffs here, that "[i]n reliance on the integrity of the market, [the plaintiffs] . . . paid artificially inflated prices for Dura securities and the plaintiffs suffered damage[s] thereby."  *Id*. at 1630 (internal quotations omitted).  *Compare id., with* Paper 28, ¶ 85 ("Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein."), and ¶ 141.  The Court held this kind of allegation fails adequately to allege loss causation.  It reasoned:

> . . . Normally, in cases such as this one (i.e., fraud-on-the-market cases), an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.
>
> For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant

58

> possesses equivalent value. Moreover, the
> logical link between the inflated share
> purchase price and any later economic loss
> is not invariably strong. Shares are
> normally purchased with an eye toward a
> later sale. But if, say, the purchaser
> sells the shares quickly before the relevant
> truth begins to leak out, the
> misrepresentation will not have led to any
> loss. If the purchaser sells later after
> the truth makes its way into the market
> place, an initially inflated purchase price
> might mean a later loss. But that is far
> from inevitably so. When the purchaser
> subsequently resells such shares, even at a
> lower price, that lower price may reflect,
> not the earlier misrepresentation, but
> changed economic circumstances, changed
> investor expectations, new industry-specific
> or firm-specific facts, conditions, or other
> events, which taken separately or together
> account for some or all of that lower price.
> . . . Other things being equal, the longer
> the time between purchase and sale, the more
> likely that this is so, i.e., the more
> likely that other factors caused the loss.

*Dura Pharms.,* 125 S.Ct. at 1631-32. Looking at the language of

the PSLRA, the common-law roots of securities fraud actions, and

the treatment of loss causation by other courts of appeals, the

Court found the Ninth Circuit's approach "inconsistent with the

law's requirement that a plaintiff prove that the defendant's

misrepresentation (or other fraudulent conduct) proximately

caused the plaintiff's economic loss." *Id.* at 1633 (citing

favorably to *Emergent Capital*, 343 F.3d at 198; *Semerenko*, 223

F.3d at 185; *Robbins*, 116 F.3d at 1448; and *Bastian v. Petren*

59

*Resources Corp.*, 892 F.2d 680, 685 (7th Cir. 1990).  From this principle, the Court found the *Dura* complaint legally insufficient because it (1) failed "to claim that Dura's share price fell significantly after the truth became known," (2) failed to specify "the relevant economic loss," and (3) failed to describe the "causal connection . . . between that loss and the misrepresentation[s]." *Id*.

Thus, in *Dura*, the Supreme Court not only endorsed, but made controlling, what had developed in the lower courts as the majority view:  although alleging that a security was artificially inflated may suffice to plead transaction causation, loss causation requires the plaintiff to point to some causal link between the alleged misrepresentations and an economic loss suffered by the plaintiff.  "The most common 'causal link' pled under this rule is a showing that the plaintiff suffered an economic loss fairly attributable to the public airing of the alleged fraud, i.e., a significant stock price decline immediately following the announcement that reveals the fraud to the public." *D.E. & J Ltd. P'ship*, 284 F.Supp.2d at 748-49, *aff'd*, 2005 WL 1386448 (6th Cir. June 10, 2005) (unpublished); *see also Lentell*, 396 F.3d at 173; *Semerenko*, 223 F.3d at 185; *Robbins*, 116 F.3d at 1447-48.

In *Lentell*, the Second Circuit affirmed the dismissal of the plaintiffs' class action complaint for failing adequately to allege loss causation.  There, the plaintiffs alleged that when they invested, they were relying on the integrity of the market (including the fraudulent statements and omissions made by the defendant company during the class period), that the shares plummeted throughout the class period, and that their investments became virtually worthless.  396 F.3d at 175.  The court held that even if the defendants' misstatements artificially inflated the market price of the company's shares, the plaintiffs nevertheless failed to allege loss causation where there was "no allegation that the market reacted negatively to a corrective disclosure regarding the falsity of [the defendants' statements] and no allegation that [the defendants] misstated or omitted risks that did lead to the loss."  *Id.; see also Robbins*, 116 F.3d at 1448 (reversing the lower court and holding that the plaintiffs failed to satisfy the loss causation requirement because there was no evidence of a connection between the defendant's misrepresentations and the economic loss, i.e., the decline in the price of the stock).

In *D.E. & J*, the court dismissed the plaintiffs' securities fraud claim for failing adequately to allege a "causal nexus" between the alleged misrepresentations and the plaintiffs'

61

economic harm.  284 F.Supp.2d at 749.  Like Plaintiffs here, the
*D.E. & J* plaintiffs alleged that a plethora of misstatements,
omissions, and violations of GAAP artificially inflated the
share price of a company's stock (Kmart Corporation) and that
the plaintiffs purchased the stocks at the inflated prices.
Moreover, like here, the price of the stock declined steadily
throughout the class period, undoubtedly resulting in economic
losses to the purchasers.  However, relying on the principles
addressed above, the court found that the plaintiffs had not
alleged    a    causal    connection    between    the    alleged
misrepresentations of the defendants "and the economic harm they
suffered as a direct result of the alleged fraud." *Id*. Although
the price of Kmart stock had declined 87% during the class
period, the court took judicial notice of the fact that "the
stock market, in general, was in a period of decline during this
period, and that "in contrast to the substantial decline in
share price that occurred" during the Class Period, "Kmart stock
dropped only $.05–from $1.22 to $1.17 [4%]–on May 15, 2002, [the
last day of the class period,] when the corrective disclosure
was allegedly made." *Id*. at 749 n.26.

Here, Acterna's share price dropped 94% during the Class
Period.  Not only do Plaintiffs not allege that the rapid
decline in Acterna's share price was caused in some way by

Defendants' alleged misrepresentations or omissions, their complaint suggests otherwise, alleging that prior to the Class Period, the global communications industry experienced a severe economic slowdown that continued throughout the Class Period. *See generally* Paper 28, ¶ 46.  As discussed above, this economic slowdown resulted in a steady decline in sales, orders, and revenues throughout the Class Period, which, Plaintiffs' complaint demonstrates, the company fully disclosed in its public filings.  This decline, however, was not unique to Acterna, as evidenced by the near 50% drop in the Dow Jones U.S. Telecommunications Index during the Class Period.  *See* Paper 25, Ex. 25.  "[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events."  *Lentell*, 396 F.3d at 174 (internal quotations omitted); *see also D.E. & J*, 284 F.Supp.2d at 749 ("[L]oss causation cannot be found if an intervening cause was responsible for the plaintiff's economic loss.").  Here, Plaintiffs have alleged no facts which, if proven, would show that their economic loss, i.e., the decline in the value of

63

their purchased stocks, was caused by the alleged misstatements of Defendants, as opposed to an alternative intervening event. In fact, Plaintiffs' allegation that "[b]y the time the Company belatedly admitted the truth – i.e., that the value of its goodwill was severely impaired – the price of Acterna's common stock had already fallen" is a clear indicator that Defendants' alleged fraudulent conduct did not cause the precipitous decline in Acterna's share price during the Class Period. *See* Paper 28, ¶ 81.

Moreover, in contrast to the sharp decline in share price that occurred during the Class Period, falling 94% from $5.48 on August 14, 2001 to $.33 on October 29, 2002, the price declined only one penny (or 3%), to $.32 , on the day Acterna announced its goodwill impairment, October 30, 2002. *See* Paper 28, ¶ 47; Paper 42, Ex. 1 (chart of Acterna's daily stock prices from December 21, 1999 to December 20, 2004). Contrary to Plaintiffs' allegation that when the company revealed the "truth" about its goodwill impairment, it "shocked the financial markets," the stock history suggests otherwise. On October 30, 2002, the day the "truth" was revealed, the share price hit a high of $0.43, well above the closing price the previous day, ultimately closing at $.32, only a penny below the previous day's closing price. This fact strongly suggests that

64

Defendants' alleged misrepresentations bore no relation to the precipitous drop that occurred during the Class Period. Moreover, although not alleged by Plaintiffs, the fact that when the alleged "truth" was revealed, or, put another way, when a corrective disclosure was made, the share price only dropped from $.33 to $.32, coupled with the fact that nearly a week later, on November 4, 2002, Acterna's stock closed at $.37, or $.04 *higher* than it did the day before the announced impairment, strongly suggests that any decline in Acterna's share price after October 30, 2002 was not a result of the alleged fraud being revealed, but rather a continuation of the rapid decline that began due to the economic slowdown commencing in 2001.[14] *See* Paper 42, Ex. 1.

In sum, Plaintiffs' only allegation as to the economic loss suffered is that they purchased Acterna common stock at artificially inflated prices. The Supreme Court, endorsing what had developed as the majority view in the lower courts, has plainly held that "the 'artificially inflated purchase price' is

---

[14]   Additionally, on December 2, 2002, over a month after the market had the opportunity to digest and consider the announced impairment, Acterna's stock price closed at $.33, the same price at which it closed the day before the impairment was revealed and a penny higher than the day it was revealed. Perhaps this accounts for the complaint's "failure to claim that [Acterna's] share price fell significantly after the truth became known." *Dura Pharms*., 125 S.Ct. at 1634.

not itself a relevant economic loss." *Dura Pharms*., 125 S.Ct. at 1634.   Like the *Dura* complaint, Plaintiffs' complaint does not claim that Acterna's share price "fell significantly after the truth became known," nor does it provide Defendants "with notice of what the relevant economic loss might be or what the causal connection might be between that loss and [Defendants'] misrepresentation[s]." *Id*.   Without the requirement that a plaintiff provide a defendant with some indication of the economic loss and the causal connection, the securities laws would become nothing more than a "partial downside insurance policy." *Id*. (citing H.R.Conf.Rep. No. 104-369, at 31).   Having failed to identify the relevant economic loss and adequately allege the causal nexus between the alleged misrepresentations of Defendants and that loss, Plaintiffs have not sufficiently pled an essential element of their ¶ 10(b), Rule 10b-5 claim. Accordingly, for this additional reason, the court will grant the individual Defendants' and PwC's respective motions to dismiss.[15]

**C.   *Section 20(a) Control Person Liability***

---

[15]   Because PwC is entitled to have the federal claims against it dismissed on the alternative grounds of failure sufficiently to allege scienter and failure to allege loss causation, the court need not consider its remaining arguments for dismissal.

Plaintiffs' failure to state a claim for a primary securities fraud violation precludes a finding of control person liability. *In re Criimi Mae*, 94 F.Supp.2d at 662 (D.Md. 2000). The court will therefore dismiss Plaintiffs' claim for violation of § 20(a) of the Exchange Act.

### D.  *Common Law Fraud and Breach of Fiduciary Duty Claims*

Under 28 U.S.C. § 1367(c)(3), the court has discretion to decline exercising supplemental jurisdiction over state law claims if the court "has dismissed all claims over which it has original jurisdiction . . . ." *See Bigg Wolf Discount Video Movie Sales, Inc. v. Montgomery County, Maryland*, 256 F.Supp.2d 385, 400-01 (D.Md. 2003).  In *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966), the Supreme Court cautioned that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surerfooted reading of applicable law."  The *Gibbs* Court went on to say that "if the federal law claims are dismissed before trial . . . the state claims should be dismissed as well." *Id.; see also Hinson v. Norwest Fin. South Carolina, Inc.*, 239 F.3d 611, 617 (4th Cir. 2001) ("[W]e conclude that under the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power

67

to dismiss the case or, in cases removed from State court, to remand, provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met.").

Plaintiffs argue in their opposition that even if the federal securities claims were dismissed, the court still has original jurisdiction over this matter pursuant to its diversity jurisdiction. *See* 28 U.S.C. § 1332(a).[16]  First, Plaintiffs failed to assert diversity as a basis for this court's jurisdiction anywhere in their complaint.  Not only is there no reference to § 1332, Plaintiffs fail to allege the citizenship of any party, nor do they allege the requisite amount in controversy.  However, in their opposition brief, they assert that § 1332's requirements are satisfied because the lead Plaintiffs, Joseph De Leo and Stan Andrews, are residents of New York and Alabama, respectively, "and each of the individual Defendants accepted service (without protest) at the Company's headquarters in Germantown, Maryland, thus evincing their status as Maryland residents."  Paper 53 at 37; *see Gilman v. Wheat, First Securities, Inc.*, 896 F.Supp. 507, 509 n.3 (D.Md. 1995)

---

[16] Section 1332 grants federal district courts original jurisdiction over civil actions where "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."

("Diversity of citizenship in a class action depends solely on the citizenship of the named parties."). Whatever the mere acceptance of service indicates about the citizenship of the individual Defendants, it demonstrates nothing about the citizenship of the remaining Defendants.[17]

However, accepting Plaintiffs' assertions as true, and assuming the citizenship of De Leo and Andrews is diverse from all Defendants, they still must meet the amount in controversy threshold. Plaintiffs contend that because De Leo's and Andrew's "*aggregate losses* were $84,169, which exceeds the $75,000 threshold for diversity jurisdiction," § 1332's requirements are met. Paper 53 at 37 (emphasis added). This plainly will not suffice, as it is clear that the "requisite amount in controversy cannot be met by aggregating the separate claims of individual class plaintiffs." *Gilman*, 896 F.Supp. at 509 (citing *Snyder v. Harris*, 394 U.S. 332, 336 (1969)). The non-aggregation rule "requires that at least one individual must have claims greater than [$75,000] for a federal court to have diversity jurisdiction over the action." *Gilman*, 896 F.Supp. at

---

[17] Moreover, although acceptance of service in Maryland is enough for this court to exercise personal jurisdiction over the individual Defendants, *see* Md.Code.Ann., Cts. & Jud. Proc. § 6-102(a) (2002), it has no bearing on the issue of subject matter jurisdiction.

509. Although not addressing this precise issue, the Supreme Court implicitly affirmed this rule in *Exxon Mobil Corporation v. Allapattah Services, Inc.*, 125 S.Ct. 2611, 2615 (June 23, 2005), when it held that "where the other elements of jurisdiction are present *and at least one named plaintiff in the action satisfies the amount-in-controversy requirement*, § 1367 does authorize supplemental jurisdiction over the claims of other plaintiffs . . . even if those claims are for less than the jurisdictional amount." *See also id.* at 2636 (Ginsburg, J., dissenting) (recognizing that "in multiparty cases, including class actions, [the Court has] unyieldingly adhered to the nonaggregation rule").

Because De Leo and Andrews impermissibly attempt to aggregate their claims to meet the jurisdictional threshold, and a review of their certifications to this court when seeking appointment as lead plaintiffs indicates that their individual claims are well below the jurisdictional threshold, this court does not have diversity jurisdiction over this matter. *See* Paper 21, Ex. C (approximate losses of $47,419 and $36,750 respectively). Because the court will dismiss the claims over which it has federal question jurisdiction, and does not have any other basis for exercising original jurisdiction, the court will decline to exercise supplemental jurisdiction over the

remaining state law claims.  Accordingly, Plaintiffs' remaining state law claims will be dismissed without prejudice.[18]

### E.   Motion to Amend the Complaint

Finally, in a footnote to one of their opposition briefs, Plaintiffs request an opportunity to amend the complaint if the court deems the claims against Defendants insufficiently pled.  *See* Paper 53 at 42 n.30.  Rule 15(a) provides in part that leave to amend "shall be freely given when justice so requires."  Fed.R.Civ.P. 15(a).  "In fact, such leave 'should be denied *only when* the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'"  *Franks v. Ross*, 313 F.3d 184, 193 (4th Cir. 2002) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999)) (internal quotation and citation omitted).  The decision whether to grant leave to amend rests "within the sound discretion of the district court."  *Davis v. Virginia Commonwealth Univ.*, 180 F.3d 626, 628 (4th Cir. 1999) (citing *Foman v. Davis,* 371 U.S. 178 (1962); *see also Medigen of Kentucky, Inc. v. Pub. Serv. Comm'n of West Virginia*, 985

---

[18] Plaintiffs request remand, rather than dismissal, of their state law claims, citing to *Hinson*.  *See* Paper 53 at 37 n.27.  This case was filed originally in this court, rather than removed from state court, and thus, is not subject to remand.

71

F.2d 164, 167-68 (4th Cir. 1993) (noting that "the federal rules strongly favor granting leave to amend").

Considering the length of Plaintiffs' complaint, which demonstrates a thorough, albeit insufficient, effort to comply with the pleading requirements of the PSLRA, and the nature of its deficiencies, particularly with respect to its inability to allege any causal connection between Plaintiffs' economic loss and Defendants' alleged misstatements, the court concludes allowing Plaintiffs an opportunity to amend would be futile. There is no indication in their lengthy and sprawling complaint, or in their opposition papers, that Plaintiffs would be able to state with particularity any additional facts giving rise to a strong inference that PwC or the individual Defendants acted with the requisite scienter. Moreover, in light of the loss causation discussion above, including the acknowledgment by Plaintiffs of intervening negative market forces, and Acterna's stock history prior to and after the alleged "truth was revealed," it appears beyond doubt that Plaintiffs can put forth no facts supporting the necessary element of loss causation. Accordingly, Plaintiffs request to amend their complaint will be denied.

**V.    Conclusion**

For the foregoing reasons, Plaintiffs' federal securities claims will be dismissed for failure to state a claim, and the remaining state law claims will be dismissed without prejudice.


                              _____/s/_____
                              DEBORAH K. CHASANOW
                              United States District Judge

                              July 26, 2005

73